UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BILLIE SORRELL | ) |
| 17 Saint Davids Court | ) |
| Stafford, VA  22556, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| John A. Wilson Building | ) |
| 1350 Pennsylvania Avenue, NW, Suite 409 | ) |
| Washington, DC 20004 | ) |
| (202) 727-3400, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**
(Gender Discrimination/Sexual Harassment/Sexual Orientation Discrimination)

A.  JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action under 28 U.S.C. §§1331, 1343; Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f); and the District of

Columbia Human Rights Act (DCHRA), District of Columbia Code §§2-1403.03(b), 2-1403.16

(2001).

2.      Venue properly lies within this District under Title VII, 42 U.S.C. §2000e-5(f),

because Defendant District of Columbia Government is located within the District of Columbia

and because plaintiff's claims arose within this judicial district.

B.  THE PARTIES

3.      Plaintiff Billie Sorrell (also known as Billie Thompson and Billie Thompson-

Sorrell) is a resident of Stafford, Virginia, and an employee of the District of Columbia

Department of Corrections (the Agency).

4.    The District of Columbia Department of Corrections is an agency of Defendant District of Columbia Government.

C.    THE FACTS SUPPORTING PLAINTIFF'S CLAIMS

5.    Plaintiff is a heterosexual female.

6.    Plaintiff has been employed by the Agency since October 17, 1983.

7.    Initially plaintiff was assigned to the Occoquan Facility in Lorton, Virginia.

8.    Plaintiff has held a variety of responsible positions for the Agency, including Acting Lieutenant at various Agency facilities.

9.    The Agency has continuously given plaintiff excellent to outstanding performance ratings.  She has never received any discipline.

10.    In November 1989, the Agency promoted plaintiff to the rank of Sergeant.

11.    In 1999, after the Agency closed its facilities in Lorton, it reassigned her to the D.C. Jail in the District of Columbia.

12.    Other than for a period of about two years, where Plaintiff worked at Center 1, a halfway house, the Agency has continuously assigned her to the D.C. Jail.

13.    The D.C. Jail is a 24-hour operation and has three shifts.

14.    Generally plaintiff worked the No. 1 (midnight) shift, from 11:30 p.m. to 8 a.m.

15.    Sergeants are rotated through various posts in the D.C. Jail.

16.    The Acting Lieutenant position has supervisory authority over all lower positions at the D.C. Jail.

17.    Sergeants on the No. 1 Shift at the D.C. Jail are rotated through the Acting Lieutenant position.

18.    Plaintiff, a sergeant, has served as Acting Lieutenant on the No. 1 shift at the D.C. Jail.

19.    The current Acting Lieutenant is assigned to supervise a Zone, which is usually three housing units and approximately eight Correctional Officers. The D.C. Jail has three floors with a total of eighteen housing units. There are six housing units per floor. Each floor has two Zones, each comprising three housing units.

20.    The Acting Lieutenant also has the freedom to move throughout the entire D.C. Jail facility.

21.    Upon information and belief, a significant percentage of the female correctional officers at the D.C. Jail is lesbian or bisexual.

22.    Upon information and belief, a clear majority of the female employees on the 1st (midnight) are lesbian or bisexual.

23.    One of plaintiff's co-workers is Sgt. Eugenia Haines, a female.

24.    Sgt. Haines is also regularly rotated into the Acting Lieutenant position at the D.C. Jail.

25.    When Sgt. Haines is the Acting Lieutenant, she has supervisory authority over plaintiff.

26.    Upon information and belief, Sgt. Haines is bisexual.

27.    Upon information and belief, Sgt. Haines formerly had a homosexual romantic relationship with another female employee at the D.C. Jail.

28.    Starting with an elevator incident in June 2003, and then from January 2005 continuing through May 2005, and then again, in April and May 2006, Sgt. Haines repeatedly harassed plaintiff sexually.

29.    In June 2003, Sgt. Haines began sexually harassing plaintiff by rubbing her body against plaintiff's body when both were in a crowded elevator.

30.    From June 2003 until January 2005, plaintiff and Sgt. Haines worked together sporadically.  Every time the parties were in physical proximity, Sgt. Haines would stand very close to plaintiff and touch her body in some way.  Plaintiff initially dismissed this unwelcome conduct as clumsiness.  However, Sgt. Haines repeatedly touched plaintiff and demonstrated that the touching was no accident.

31.    In January 2005, plaintiff and Sgt. Haines were both assigned to the same midnight shift with the same days off (Friday and Saturday), so plaintiff and Sgt. Haines were present in the Jail together five shifts per week.

32.    On a continuous basis, from January 2005 through May 2005 and from April 2006 through May 2006, whenever Sgt. Haines had the opportunity, she would repeatedly rub her body against plaintiff's body when both were together in crowded elevators.

33.    Plaintiff would repeatedly ask Sgt. Haines to refrain from touching or rubbing her body.

34.    When others were present on the elevator, Sgt. Haines would loudly apologize in an effort to pretend that she had accidentally touched plaintiff's body.

35.    Even after she made numerous apologies that for "accidentally" touching plaintiff's body, Sgt. Haines would deliberately continue to rub her body against plaintiff's body each time an opportunity occurred.

36.    Also, on virtually a daily basis from January 2005 through May 2005 and from April 2006 through May 2006, Sgt. Haines watched, stared at, and followed plaintiff throughout the Jail facility.

37.    Plaintiff constantly indicated her discomfort at Sgt. Haines's unwelcome physical advances by moving away from Sgt. Haines whenever she approached her.

38.    Sgt. Haines's sexual harassment of plaintiff extended into the staff parking lot. Sergeants were allowed to go outdoors during their shift, and at some time during the night shift Sgt. Haines would move her pick-up truck to park next to or directly across from plaintiff's car.

39.    Several times per week, in the morning at the end of the shift, as plaintiff approached her car, Sgt. Haines would lean up against her pick-up truck in the Jail parking lot, touching and rubbing her crotch with her hand while she simultaneously smiled at plaintiff, licked her lips, and lowered her eyelids in a sexually provocative manner.

40.    Typically at the end of the midnight shift, plaintiff and her co-workers would have breakfast. This group would stay in the parking lot and wait for one another to get off duty so that together they could decide which restaurant to meet at for breakfast. Sergeants would get off duty first, but lower-ranking staff had to wait until their relief on the next shift came in before leaving their posts.

41.    On a couple of occasions, when plaintiff was alone in the parking lot, before the rest of her co-workers reached the parking lot, Sgt. Haines, also recently off-duty, would invite plaintiff to have breakfast with her. Both times plaintiff refused.

42.    Plaintiff has never indicated to Sgt. Haines that she was interested in having any type of romantic friendship or sexual relationship with Sgt. Haines or any other woman.

43.    Whenever possible, plaintiff actively avoided Sgt. Haines. Plaintiff would avoid places within the Agency where she thought Sgt. Haines might be, such as the assembly room, the bathroom, the officers' lounge, and the dining hall.

44.    If plaintiff was on the elevator and the doors opened and Sgt. Haines was standing outside it, plaintiff would either get off the elevator and take the stairs or wait for the next elevator.

45.    If plaintiff was in the medical unit with the officers and staff, Sgt. Haines would suddenly appear in the medical unit.  At that time, plaintiff would leave the medical unit and relocate elsewhere in the facility.

46.    During daily work breaks, plaintiff and co-worker friends would usually play pool in the billiard room.  Sgt. Haines would arrive, take a seat, and stare at plaintiff's buttocks as she bent over the pool table to play pool.  Plaintiff would then put down her cue stick and leave. Eventually, plaintiff avoided the billiard room altogether.

47.    During another early morning daily break, plaintiff would go to the television room at 5 a.m. to watch the early morning news.  At 5 a.m., Sgt. Haines would also appear in the television room where plaintiff sat.  When Sgt. Haines appeared, plaintiff would leave.

48.    Beginning in February 2005 and continuing to the present day, plaintiff has regularly been treated by a psychiatrist because of the anxiety and depression which she developed due to the sexual harassment she suffered by Sgt. Haines and the Agency's failure to stop it.

49.    The psychiatrist has diagnosed plaintiff's profound symptoms as depression, anxiety, and chronic post-traumatic stress disorder.

50.    Since February 2005, Plaintiff's psychiatrist has treated plaintiff with psychotherapy, either weekly or every other week, and with medications.

51.    On or about April 5, 2005, Sgt. Haines sought plaintiff out during a roll call and stood approximately twelve inches behind her.  Plaintiff could feel Sgt. Haines breathing on her

neck and decided to move to the other side of the room, but Sgt. Haines followed her and stood next to her. During that roll call, which lasted for thirty minutes, plaintiff moved away from her a total of three times. Sgt. Mark Queen observed all this and later exclaimed to plaintiff, "Damn! She wants you!"

52.     Later on or about April 5, 2005, plaintiff reported the roll-call incident to her supervisor, Lt. Isaiah Cobb, and her shift commander, Capt. Walter Coley, in Capt. Coley's office. Plaintiff told them that she wanted them to do something about Sgt. Haines's sexual harassment.

53.     In response to plaintiff's complaint about Sgt. Haines, both Capt. Coley and Lt. Cobb laughed at plaintiff and teased her about Sgt. Haines's sexual harassment.

54.     Thus, Lt. Cobb stated, "Now, Thompson, you know how Haines is, she just likes whoever she sees," as if to say that plaintiff should accept her sexual harassment without objecting.

55.     On or about April 10, 2005, Sgt. Haines sexually touched plaintiff again. Plaintiff and another Agency employee, Cpl. James A. Jones, were exiting through a security gate. Sgt. Haines was ahead of Cpl. Jones and already waiting to exit. Cpl. Jones offered to let Sgt. Haines proceed through with his key. Sgt. Haines declined. Instead, she placed herself between Cpl. Jones and plaintiff and closed the gate to reduce the space in the opening, so that when plaintiff exited, Sgt. Haines's breasts rubbed across plaintiff's breasts. During this touching incident, Sgt. Haines looked at plaintiff lustfully. Before plaintiff could confront her, Sgt. Haines made an apology to plaintiff to induce Cpl. Jones to believe that she had accidentally rubbed her breasts across plaintiff's breasts.

56.    On or about April 28, 2005, Sgt. Haines once again entered the Agency elevator and, although plaintiff positioned herself between Sgt. Kenneth Graham, Cpl. Marsha Rose, and the elevator wall to avoid "accidental" contact from Sgt. Haines, Sgt. Haines still maneuvered her way into plaintiff's space so that she could rub her body up against plaintiff's.  Plaintiff demanded, "Will you please stop touching me!"  Sgt. Haines denied the accusation and acted as if the touching was accidental.

57.    Sometimes, when serving as Acting Lieutenant, Sgt. Haines needed to come to plaintiff's post, called the "bubble," mainly to sign the unit log books.  (The bubble is a locked office containing all the switches that lock and unlock all doors in the Jail, including the sally-port doors.  The bubble also contains all the log books requiring the Acting Lieutenant's signature.)

58.    Before plaintiff would let Sgt. Haines through the sally-port to her post, plaintiff would gather the books that Sgt. Haines needed to sign and try to hand them to her so that plaintiff would not be alone with Sgt. Haines inside the bubble.  Alternately, plaintiff would place the log books on a chair outside the bubble and lock herself inside the bubble.  However, even if the bubble door was locked, Sgt. Haines would often fabricate a need to gain entrance into the bubble with plaintiff by saying she needed to use the telephone or the unit radio.  Once inside the bubble, Sgt. Haines would often try to strike up a conversation with plaintiff.

59.    In one particular incident when plaintiff was in the bubble and Sgt. Haines had to enter to sign the log books, Sgt. Haines started talking to plaintiff about how she was a big real-estate tycoon and that she was getting rich by buying housing and allowing the Government to rent them to low income residents in Virginia.  By making this grandiose allusion, Sgt. Haines

attempted to elevate her financial position to plaintiff to entice her to have a romantic relationship.

60.    On the first (midnight) shift, groups of openly lesbian workers would gather nightly in the lounge, at the hallway post on Floor Control 3, or in the parking lot. Plaintiff heard these groups of openly lesbian workers talk about paying heterosexual female co-workers to have sexual relations with them and recounting intimate details of those sexual encounters.

61.    Sgt. Haines was friendly with this group of openly lesbian women, so when she bragged to plaintiff that she was rich, plaintiff became uncomfortable because she had previously overheard those discussions by the openly lesbian women about paying heterosexual female co-workers for sex.

62.    On at least two occasions after April 5, 2005, plaintiff complained to Lt. Cobb about Sgt. Haines's sexual harassment of her. However, Lt. Cobb repeatedly refused to entertain any of her complaints against Sgt. Haines and would make excuses for her behavior. He would change the subject or make sarcastic statements like, "I'm scared of sexual harassment," and walk away.

63.    Previously, in 2004, Cpl. Vera Barnett, a female, charged Lt. Cobb, a male, with sexual harassment.

64.    An Agency investigation team, led by Fred Staten, an Agency EEO Officer, found Lt. Cobb guilty of sexual harassment and recommended that he be removed from his position.

65.    During Lt. Cobb's appeal of his removal for alleged sexual harassment of Cpl. Barnett, Sgt. Haines was a witness in his defense and was very instrumental in helping Lt. Cobb retain his job. Upon information and belief, this could be why Lt. Cobb refused to act on plaintiff's complaints against Sgt. Haines.

66.    The Agency ultimately placed Lt. Cobb on 45 days administrative leave without pay as disciplinary action for his sexual harassment of Cpl. Barnett.

67.    From May 2005 to April 2006, Sgt. Haines was absent from work, assertedly due to a work-related injury.

68.    On or about June 17, 2005, plaintiff filed an administrative complaint against defendant with the Equal Employment Opportunity Commission (EEOC), alleging gender discrimination by the Agency in allowing Sgt. Haines to harass her sexually.

69.    The Agency did not keep plaintiff's EEO complaint confidential.

70.    On or about July 18, 2005, in the presence of Lt. Penny C. Jackson, Capt. Tyrone Harrison issued plaintiff a memorandum from Dennis Harrison, Acting Warden, informing her that the Agency had received her EEOC complaint and instructed her to avoid any contact with Sgt. Haines until EEOC had fully investigated the allegations.

71.    Simultaneously, on the same day the Acting Warden mailed a substantially similar memorandum to Sgt. Haines, ordering her to avoid any and all contact with plaintiff, both on and off-duty.

72.    After Sgt. Haines returned to duty in April 2006, although the Agency was fully aware of plaintiff's sexual harassment complaint against Sgt. Haines and the Acting Warden had issued both parties memoranda ordering them to avoid any and all contact with one another, the Agency once again assigned Sgt. Haines to the supervisory position of Acting Lieutenant on the midnight shift, the same shift and days on which it assigned plaintiff.

73.    Despite the Acting Warden's memorandum requiring that she avoid any and all contact with plaintiff, Sgt. Haines continued to harass plaintiff, both as a fellow Sergeant and as Acting Lieutenant in a supervisory capacity over plaintiff.

74.    While Sgt. Haines was supervising plaintiff as Acting Lieutenant, she continued to rub her body against plaintiff's body, stare at plaintiff, follow plaintiff around; and, in the parking lot, would rub her own body when encountering plaintiff.

75.    While Sgt. Haines was acting as a fellow sergeant, she would repeat this same unwelcome sexual conduct toward plaintiff.

76.    Plaintiff nonetheless complied with the Acting Warden's memorandum and avoided contact with Sgt. Haines.  For example, to avoid Sgt. Haines when she came to her immediate work area, plaintiff would trade places with Cpl. W. Glasper and work as Floor Officer, placing Cpl. Glasper as Acting Sergeant until Sgt. Haines had left plaintiff's work area.

77.    Once Sgt. Haines had returned to work in April 2006, officers would jokingly ask plaintiff if she needed an "escort" to her car.  These remarks were not made out of genuine concern for plaintiff's safety, but instead as sarcastic humor, indicating that the officers thought Sgt. Haines's conduct was funny.

78.    Simultaneously, staff members repeatedly questioned plaintiff about her accusations against Sgt. Haines, making her feel even more uncomfortable.

79.    Sgt. Haines also made remarks to staff members about plaintiff, such as, "[She] would be surprised to find out who she was involved with on the job."

80.    In April 2006, after Sgt. Haines returned to duty, plaintiff became the target of lesbian jokes by men and lesbian women staff.  As plaintiff walked by a group of men and openly lesbian women, she would hear remarks such as, "She's fine!" or "Damn, she's fine!" directed at her.  Such remarks might be made initially by a lesbian woman in the group, but a man or men in the group would also agree with them.

81.     Plaintiff was humiliated to be the ongoing topic of Agency employee conversations and lesbian jokes.

82.     Sometime after Sgt. Haines returned to duty in April 2006, an unknown vandal twice defaced plaintiff's automobile, by "keying" the sides of plaintiff's vehicle, causing deep scratches in the paint.

83.     Also after Sgt. Haines returned to duty in April 2006, someone left two notes on plaintiff's car windshield.  One note said, "Happy Birthday, Boo," with hearts drawn on it.  A second note said, "I'm going to get you bitch!"

84.     Also after Sgt. Haines returned to duty in April 2006, she would publicly stare at plaintiff with an angry frown on her face whenever plaintiff encountered her in the workplace.

85.     Meanwhile, plaintiff started to withdraw and refused to leave her assigned unit out of fear of personal bodily harm if she encountered Sgt. Haines alone.

86.     As plaintiff knew, Sgt. Haines had previously been involved in an argument with Cpl. Sylvia Cephas, in which Sgt. Haines falsely accused Cpl. Cephas of threatening to kill her. That argument resulted in a court case which Sgt. Haines brought against Cpl. Cephas.

87.     In April or May 2006, when Sgt. Haines still approached her, plaintiff informed Lt. Jackson, Lt. Snow, and Lt. Hardwick about the memorandum from the Acting Warden requiring her and Sgt. Haines to avoid any and all contact with one another and wanted to know if it was in her record.  She also wanted to know why the Agency was not following this memorandum by separating Sgt. Haines from her.

88.     Even though Lt. Jackson had been present in the meeting with Capt. Harrison when plaintiff received the order, she denied knowledge of the Acting Warden's memorandum.

89.    In April 2006, when Sgt. Haines returned, plaintiff believed Sgt. Haines might be violent towards her and began to experience nightmares in which Sgt. Haines physically attacked her.

90.    Plaintiff also became terrified to be alone anywhere in the building, out of fear of encountering Sgt. Haines.

91.    Plaintiff would walk to her post with other staff and would decline her lunch break to avoid contact with Sgt. Haines or staff lesbian jokes; she would not leave her unit until the next morning.

92.    Also in or about April 2006, plaintiff developed insomnia and would sleep only two to three hours within a 24-hour cycle.

93.    Plaintiff also developed stress-related eczema.

94.    Plaintiff would often have suicidal thoughts because she could not bear the thought of being considered lesbian or bisexual.

95.    On or about May 22, 2006, plaintiff's psychiatrist recommended that she take medical leave to avoid further psychological damage, due to continued exposure to inappropriate sexual touching and stalking without proper supervisory intervention.

96.    Plaintiff began her leave from employment on or about May 25, 2006, first exhausting her approved leave and sick leave.

97.    Sgt. Haines sexually harassed plaintiff until that time.

98.    From about June 1, 2006, through the present, plaintiff has been on approved leave without pay (LWOP) from her employment at the D.C. Jail.

99.    At the time she began her LWOP, the Agency was paying plaintiff about $60,000 per year, including night pay differential.

100.    However, plaintiff not only has received no income since about June 1, 2006; she has had to pay out of pocket for her medical care and medications.

D.    STATEMENT OF PLAINTIFF'S CLAIMS

Count I:   Gender Discrimination (Title VII)

101.    Plaintiff adopts and incorporates by reference paragraphs 1-100 above.

102.    Title VII makes it unlawful for an employer to discriminate in employment on the basis of gender.

103.    Sexual harassment is a subcategory of gender harassment.

104.    Sexual harassment, even between persons of the same sex, is improper.

105.    When the employer is aware of such sexual harassment and does not attempt to stop it, and the sexual harassment continues, it becomes liable to the harassee.

106.    Here, as indicated above, from 2003 through May 2005 and again in April-May 2006, Sgt. Haines sexually harassed plaintiff repeatedly and in plain sight of plaintiff's colleagues and supervisors.

107.    As also described above, beginning on or about April 5, 2005, plaintiff repeatedly apprised her immediate supervisor and her shift commander of Sgt. Haines's sexual harassment, but they did not investigate plaintiff's complaint, but rather dismissed plaintiff's sexual harassment Complainant as a non-issue.

108.    Moreover, the Agency did not try to stop Sgt. Haines's sexual harassment, and it continued though May 2005 and again in April-May.

109.    By allowing Sgt. Haines to harass plaintiff sexually between June 2003 and May 2005 and again in April-May 2006, defendant violated Title VII, 42 U.S.C. §2000e-2(a)(1).

110.    As a result of the above-described discrimination, plaintiff has suffered, and is suffering, considerable pecuniary injury, including loss of present and future earnings and benefits, and severe emotional distress.

### Count II.  Gender/Sexual Orientation Discrimination (DCHRA)

111.    Plaintiff adopts and incorporates by reference paragraphs 1-110 above.

112.    The District of Columbia Human Rights Act ("DCHRA"), District of Columbia Code §§2-1401.01 et seq. (2001), prohibits discrimination in employment "for any reason other than that of individual merit," including gender and sexual orientation.

113.    The DCHRA, D.C. Code §2-1401.02(28), defines "sexual orientation" to mean "male or female homosexuality, heterosexuality and bisexuality, by preference or practice."

114.    The DCHRA, D.C. Code §2-1402.11(a)(1) (2001), also makes it "an unlawful discriminatory practice" for an employer to discriminate in employment "wholly or partially" for one of the proscribed discriminatory reasons.

115.    As explained above, defendant continuously tolerated Sgt. Haines's sexual harassment plaintiff, even after plaintiff filed an EEOC complaint over that harassment.

116.    In permitting that sexual harassment, defendant discriminated against plaintiff wholly or partially because of her gender and/or sexual orientation, in violation of the DCHRA, D.C. Code §§1-2512(a)(1), 2-1402.11(a)(1) (2001).

117.    As a result of the above-described discrimination, plaintiff has suffered, and is suffering, considerable pecuniary injury, including loss of present and future earnings and benefits, and severe emotional distress.

E.  REMEDIES

118.    WHEREFORE, plaintiff respectfully requests that the Court issue a judgment

granting her the following relief from defendant:

a)    Backpay for the pay which plaintiff has lost because of her need to take leave

since May 25, 2006;

b)    Restoration of leave which plaintiff has been required to take because of the

psychological damages she has experienced as a result of the above-described discrimination;

c)    Compensatory damages and punitive damages under the DCHRA, D.C. Code

§§2-1403.13(a), 2-1403.16(b) (2001), for maliciously and wrongfully discriminating against

plaintiff;

d)    Alternatively, compensatory damages and punitive damages up to the amount of

$300,000 under Title VII and Section 102 of the Civil Rights Act of 1991, 42 U.S.C.

§§1981a(a),(b)(3)(A), for maliciously and wrongfully discriminating against plaintiff;

e)    Prejudgment and postjudgment interest thereon, effective June 17, 2005;

f)    Reasonable attorneys' fees and costs under the DCHRA, D.C. Code 2001, §§2-

1403.13(a)(1)(E), 2-1403.13(a)(2), 2-1403.16(b), and Title VII, 42 U.S.C. §2000e-5(k); and

g)    Such other and further relief as to the Court seems just and warranted.

F.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

119.    Plaintiff has the right under the DCHRA, D.C. Code §§2-1403.03(b), 2, 2-

1403.16 (2001), to bring this private cause of action for alleged violations of said Act, without

the necessity of exhausting any particular administrative remedies which were also available to

her.

120.    The unlawful discrimination and sexual harassment described above began before, but continued into, the one-year period before plaintiff filed this complaint.

121.    Also, as mentioned above, on or about June 17, 2005, plaintiff pro se filed an administrative complaint against defendant with EEOC, alleging gender discrimination by the Agency.

122.    That complaint, which was docketed as Charge No. 100-2005-01281, made essentially the same allegations as are in the instant Complaint.

123.    That complaint timely complained of gender discrimination against plaintiff.

124.    On or about February 8, 2007, EEOC dismissed plaintiff's EEOC charge and notified her of her right to sue defendant in court within 90 days of her receipt of said notice.

125.    On or about February 10, 2007, plaintiff received that EEOC notice.

126.    The instant complaint is filed within 90 days of plaintiff's receipt of the EEOC notice and within one year of the alleged discrimination and is therefore timely under both statutes.

G.  JURY TRIAL DEMAND

127.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

VERIFICATION

I hereby certify under penalty of perjury that I am the plaintiff in the above-captioned

case; that I have read the foregoing Verified Complaint; and that the facts related herein are true

and correct to the best of my knowledge, information, and belief.

Executed at Washington, D.C., this _____ day of May, 2007.


_____

BILLIE SORRELL



Respectfully submitted,


_____

ALAN BANOV #95059
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: (202) 842-9331
ab@banovlaw.com
Attorney for Plaintiff

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

## I (a) PLAINTIFFS

BILLIE SORRELL, 17 Saint Davids Court , Stafford, VA  22556

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF      88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Alan Banov, Alan Banov & Associates
1819 L Street N.W., Suite 700
Washington, DC  20036
202-822-9699

## DEFENDANTS

DISTRICT OF COLUMBIA

Case: 1:07-cv-00854
Assigned to: Roberts, Richard W.
Assign. Date : 05/08/2007
Description: Employ Discrim.

441-4th St., N.W., 6th Floor South
Washington, D.C. 20001

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- O  1 U.S. Government Plaintiff
- ⊙  3 Federal Question (U.S. Government Not a Party)
- O  2 U.S. Government Defendant
- O  4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| O **A.** *Antitrust* | O **B.** *Personal Injury/ Malpractice* | O **C.** *Administrative Agency Review* | O **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| O **E.** *General Civil (Other)* | **OR** | O **F.** *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ G. *Habeas Corpus/ 2255* | ● H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
● 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Sexual harassment/gender and sexual orientation discrimination, under Title VII, 42 USC 2000e-2, and D.C. Human Rights Act, DC Code 2-1402.11

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 300,000+   Check YES only if demanded in complaint  JURY DEMAND: YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE May 8, 2007    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.